IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

WILLIAM C.,

              Plaintiff,

    v.

COMMISSIONER, SOCIAL
SECURITY ADMINISTRATION,

          Defendant.

CIVIL ACTION FILE NO.

1:18-CV-3355-JFK

## FINAL OPINION AND ORDER

Plaintiff in the above-styled case brings this action pursuant to § 205(g) of the

Social Security Act, 42 U.S.C. § 405(g), to obtain judicial review of the final decision

of the Commissioner of the Social Security Administration ("SSA") which denied his

application for disability insurance benefits ("DIB") and supplemental security income

("SSI"). For the reasons set forth below, the court **ORDERS** that the Commissioner's

decision be **AFFIRMED**.[1]

On September 30, 2013, Plaintiff William C. ("Plaintiff" or "the claimant") filed

applications for DIB and SSI alleging that he became disabled on September 4, 2013.

[Record ("R.") 215–229 / Exhibits 1D, 2D]. After Plaintiff's applications were denied

---

[1] Plaintiff's counsel elected to forego oral argument.

initially and on reconsideration, an administrative hearing was held on July 26, 2016.[2]

[R. 37–89]. The Administrative Law Judge ("ALJ") issued a decision denying Plaintiff's application on August 14, 2017. [R. 7–27]. The Appeals Council denied Plaintiff's request for review on May 25, 2018. [R. 1–6]. Having exhausted his administrative remedies, Plaintiff filed a complaint in this court on July 13, 2018, seeking judicial review of the final decision of the Commissioner. [Doc. 1]. The parties have consented to proceed before the undersigned Magistrate Judge.

## I.    Statement of Facts

The ALJ found the following facts [R. 12–22] as modified herein.

Plaintiff, born October 24, 1975, alleges disability and seeks both DIB and SSI due to hypertension, hyperlipidemia, mild spondylosis of the cervical spine, mild degenerative disc disease of the lumbar spine, obesity, and chronic pain. Plaintiff's prior work history includes lubrication servicer, materials handler, and tire technician. [R. 21]. The claimant last worked full time in September 2013. The records reveal that the claimant weighed 286 pounds and possessed a BMI (body mass index) of

---

[2] Plaintiff was advised of his right to representation by counsel at the hearing as well as the benefits of having counsel assist him and the limits on attorney fees in the event of an award of benefits and elected to waive his right to representation and proceed without an attorney representative. [R. 43–45].

2

38.79, increased to 39.4 by October 2016, which constitutes obesity. [Exhibits 4F, 11F].

Plaintiff's Testimony

The claimant is married and testified that he and his wife and their three children (six-year-old twin boys and a ten-year-old daughter) were living with his wife's parents.[3] [R. 63]. According to Plaintiff, he is physically unable to perform any household chores, as he experiences pain all over his body. [R. 64–65]. For instance, Plaintiff testified that, if he gets up and takes a shower, he has to sit down and rest because he hurts so bad. [R. 64]. Plaintiff asserted that his medical providers have advised him that the pain he experiences is due to the "tumor" taking over the main nerve in his back.[4] [R. 64]. Plaintiff testified that the tumor is inoperable due to its location and risk of paralyzing or killing him. [R. 64, 66–67]. Plaintiff testified that, when Dr. Guo first discovered the tumor, she told him that he would not be able to

---

[3] Plaintiff also has an eleven-year-old son from a previous marriage who lives with his mother. [R. 63].

[4] The ALJ found that the medical evidence did not establish the existence of any tumor but rather shows fat deposits near the lumbar spine. [R. 20]. Plaintiff represented to the ALJ that he had a Magnetic Resonance Imagining ("MRI") of his lumbar spine earlier in 2016 at Piedmont Fayette Hospital and that his most recent MRI was ordered as a follow up for the tumor on his spine and revealed that the tumor growing on his spine had "grow[n] over [his] main nerve in [his] back . . . all the way into the root . . . causing nerve damage." [R. 48–50].

3

work again and that the tumor was the cause of all of his complications, including causing his blood pressure to spike. [R. 68–69, 71].

Regarding specific limitations, the claimant testified that he could sit for less than an hour and "then it just kills [him and he has] a hard time getting comfy." [R. 77]. He stated that sitting during the hearing was hurting him and that "the pressure [was] going all through [his] body." [R. 77]. The claimant described the pain as "unbearable." [R. 77]. The claimant also reported that he had a hard time sleeping at night due to pain and that he tosses and turns and is up and down all night. [R. 77–78]. He testified that he is able to walk approximately one hundred feet (i.e., from the parking lot handicapped space and into the store) before having to stop and rest due to pain. [R. 78]. Plaintiff also stated that a couple of times when walking his legs have given out on him and caused him to fall. [R. 64]. According to the claimant, during his typical day, he gets up and eats breakfast and then sits and watches television. He may get up and go outside for a little bit and then sit again to watch the kids. [R. 78]. He stated that he is up and down standing or sitting throughout the day and then he "get[s] to hurting so bad" that he has to lay down in the bed. [R. 78]. The claimant represented that he cannot lift much (i.e., gallon of milk, a cooking pan) due to his hands locking up and dropping things. [R. 79–80]. The claimant also testified that he is prescribed glasses and requires his wife's help with reading. [R. 80–81].

4

During the hearing, the claimant testified that he receives ongoing treatment and takes medications for his impairments. As of the hearing date, the records submitted to the ALJ did not include treatment records beyond 2013, with the exception of a neurology visit at Piedmont Physicians Neurology in July 2014. [R. 47–48; Exhibit 6F]. The ALJ requested medical records with the claimant's permission, and the record has been supplemented since.

Plaintiff testified that he takes the following medications: Lisinopril and Amlodipine at bedtime (for high blood pressure), Cyclobenzaprine (as needed for pain), Ibuprofen (as needed for pain), Hydrocodone-Acetaminophen / Vicodin (as needed for pain), Ranitidine at bedtime (for stomach), Sumatriptan (as needed for migraines), Clonidine (as needed for blood pressure), Chlortab (for allergies), and Chlorpheniraminei Maleate (for allergies). [R. 59–60; Exhibit 12E].

Medical Evidence of Record

In September 2013, the claimant presented to Piedmont Newnan Hospital's Emergency Room ("ER") for complaints of pain. [Exhibit 2F]. The claimant reported a history of headache radiating down the neck. He rated his pain level as five out of ten, with ten being the most severe pain. Although the claimant was assessed with having hypertension, his blood pressure level was 128/78 on September 4, 2013. A chest x-ray showed that there were no acute cardiopulmonary findings. [Exhibit 2F at

9]. A Computed Tomography ("CT") scan of the claimant's head (without contrast) demonstrated no acute intracranial abnormality. A CT scan of the claimant's cervical spine depicted evidence of degenerative changes. In addition, an MRI of his cervical spine showed evidence of "minimal" disc bulge, but there were no other abnormalities. The records revealed that the claimant was assessed with having "mild" spondylosis of the cervical spine, and he received an injection for pain. There was evidence of edema, but the records described the claimant as being in no acute distress and the ER notes show that the claimant was stable throughout and that the hospital was "without objective evidence for acute process requiring urgent intervention or hospitalization." [Exhibit 2F at 21]. The clinical impression was documented as chest pain and paresthesia (i.e., tingling and numbness; loss of sensation). The claimant was counseled on specific conditions that would warrant his return to the ER.

The claimant was treated by Xiaoyan Guo, M.D. ("Dr. Guo"), a board certified neurologist with Piedmont Medical Care, from September 2013 through approximately September 2015.[5] [Exhibit 4F]. On September 5, 2013, the claimant presented for a consultation to address persistent headaches, neck pain, and paresthesia symptoms.

---

[5] During the July 2016 hearing before the ALJ, Plaintiff testified that he was no longer being treated by Dr. Guo because the practice did not take Plaintiff's insurance anymore. [R. 50, 52]. According to Plaintiff, he had been referred to a neurologist that accepts his insurance but had not called yet and did not have any scheduled appointments. [R. 50].

[Exhibit 4F at 22]. The claimant complained of headaches located in the occipital, temporal, and frontal areas. He rated the severity of his pain as a ten and characterized the pain as aching, shooting, and throbbing. [Exhibit 4F at 13]. The claimant described the onset of his headaches as gradual. He reported no prior similar headaches and no relief with medication. Plaintiff also complained of neck pain and represented experiencing intermittent tingling, numbness, and muscle cramps on the upper and lower extremities. The claimant denied gait disturbances and reported no falls. The claimant reported an ER visit the day prior due to headache pain. In addition, the claimant reported a prior CT of the brain that showed no structural abnormalities and a CT of the C spine at the ER that showed degenerative changes on the C3-4 level. As of October 2013, according to the claimant, his prior medical history included diagnoses for the following conditions: myocardial infarction, hypertension, tendonitis of the hands and feet, carpal tunnel syndrome, arthritis, heart attack, coronary artery disease, bone spur (neck), herniated cervical disc, migraine, and pneumonia. [Exhibit 4F at 7]. Subsequent records reveal that the claimant reported chronic pain that may have been due to fibromyalgia.[6]

---

[6] Fibromyalgia is a long-lasting or chronic disorder that causes muscle pain and fatigue (feeling tired). See https://www.niams.nih.gov/health-topics/fibromyalgia (last viewed September 11, 2019). The ALJ noted the lack of testing for fibromyalgia. [R. 16]. According to the National Institutes of Health, there are no laboratory tests to diagnose fibromyalgia. Id. Instead, doctors rely on guidelines to help diagnose

On October 4, 2013, Dr. Guo restricted the claimant from working temporarily due to persistent pain and headaches. In response to the claimant's complaints of severe pain in his head and neck, the record shows that Dr. Guo initially recommended the claimant for a twenty-hour work week and excused him from work for only four days. [Exhibit 4F at 15]. Dr. Guo opined that the claimant could resume performing full-time work if he is doing well.[7] The claimant was to continue on Lyrica, continue B12 injections, and call if symptoms worsened or if he experienced new symptoms. After the claimant reported that his employer would not allow part time work, Dr. Guo changed her position and directed that the claimant not work at all. Dr. Guo's progress notes read: "He is not able to go back to job since his employer does not let him try out the part time first." [Exhibit 4F at 9].

On October 25, 2013, the claimant again rated his neck pain as a ten. The claimant continued with his prescribed medication regimen, with the exception of

---

fibromyalgia, including a history of widespread pain lasting more than three months, physical symptoms including fatigue, waking unrefreshed, and cognitive (memory or thought) problems, and the number of areas throughout the body in which you had pain in the past week. Id.

[7] These records contradict Plaintiff's testimony that Dr. Guo deemed him permanently precluded from all work activity in September 2013. [R. 68 (Plaintiff testified that Dr. Guo had a full body MRI done and called him to come into the office and "told me that they found that tumor and she told me that I wouldn't be able to work no more and she put me completely out of work")].

8

Lyrica as the claimant did not report any benefit. [Exhibits 12E, 2F, 4F at 9–10, 15, 23, and Exhibit 10F].

On October 21, 2013, Plaintiff was seen in the ER at Piedmont Fayette Hospital for chest pain and headache. [Exhibit 3F]. The ER addressed the claimant's blood pressure and examined him. The claimant also had an MRI. The imaging showed no acute abnormality and no high-grade stenosis, aneurysm, or other abnormality. ER progress notes report that the claimant was "[a]mbulatory in ED without difficulty." [Exhibit 3F at 42]. The claimant was prescribed medicine for pain and discharged to home the following day.

On May 5, 2014, the claimant was seen by Dr. Guo for follow up due to persistent headaches over the past several months. [Exhibit 6F at 11]. Dr. Guo's progress notes state that the claimant's overall symptoms remain about the same, that the claimant still experiences the pain on a daily basis, and that the claimant is not able to function due to the pain. [Exhibit 6F at 11].

On May 14, 2014, Dr. Guo conducted an EMG and Nerve Conduction Study to evaluate possible causes for the claimant's reported tingling, numbness, and pain on both lower extremities. [Exhibit 6F at 8–9]. Dr. Guo's impression of the nerve conduction study reads:

1.  There is no electrophysiological evidence of any large fiber sensory motor polyneuropathy on both lower extremities.

2.  No evidence of myopathy.

[Exhibit 6F at 9].[8]

Plaintiff also underwent testing with Southern Vein Care TCR, affiliated with Piedmont Healthcare, on May 14, 2014. [Exhibit 6F at 10]. Dr. Guo ordered the study of the claimant's reported "[b]ilateral leg claudication and rest pain." [Exhibit 6F at 10]. According to the Lower Extremity Arterial Physiologic Report, "[t]he patient states that his feet will turn a reddish blue color while walking and will go away with rest." [Exhibit 6F at 10]. The claimant's bilateral lower extremity arterial testing reflected no evidence of arterial disease at rest. [Exhibit 6F at 10]. The quality of the study was noted to be "excellent." [Exhibit 6F at 10].

On June 24, 2014, the claimant underwent a fluoroscopy lumbar puncture "to check the opening pressure due to the suspicion of pseudotumor cerebri." [Exhibit 6F at 2–5]. The lumbar puncture was unremarkable and revealed "[n]o evidence of pseudotumor cerebri" and "no evidence of CNS infection." [Exhibit 6F at 6]. And the

---

[8] The term "myopathy" refers generally to "neuromuscular disorders in which the primary symptom is muscle weakness due to dysfunction of muscle fiber. . . . Other symptoms of myopathy can include muscle cramps, stiffness, and spasm." National Institutes of Health, National Institute of Neurological Disorders and Stroke, https://www.ninds.nih.gov/Disorders/All-Disorders/Myopathy (last viewed September 12, 2019).

AO 72A
(Rev.8/82)

claimant tolerated the procedure well. Upon physical examination, the claimant possessed normal strength, normal sensory, and a normal gait despite his spinal impairments. [Exhibit 6F].

On July 2, 2014, the claimant saw Dr. Guo for follow up and to discuss results of the lumbar puncture. [Exhibit 6F at 2–5]. The claimant continued to complain of frequent severe headaches along with neck pain and intermittent tingling, numbness, and muscle cramps on the upper and lower extremities. The claimant again denied having any gait disturbances or falls. [Exhibit 6F at 5]. According to Dr. Guo, the claimant reported no relief despite use of both over-the-counter and prescribed pain medications and that a one-time injection of Toradol also did not provide the claimant with adequate relief. Dr. Guo's progress notes state that the claimant's lumbar puncture and CTA of the brain and neck were all unremarkable. Dr. Guo noted that the claimant's previous MRI of the brain showed no structural abnormalities and that MRI of the C spine showed mild spondylosis. Dr. Guo's neurological examination of the claimant was normal and / or appropriate in all areas. With respect to recent labs and evidence of any stroke activity, Dr. Guo noted in pertinent part:

> Radiologist mentioned about old infarct on the left basal ganglia region, I reviewed the film. I do not think patient has a[n] old infarct, the lesion on the left basal ganglia region represents the small choroidal cyst.

AO 72A
(Rev.8/82)

[Exhibit 6F at 6].[9]  Dr. Guo's assessment identified headache, chronic pain. [Exhibit 6F at 6 ("The diffuse pain most likely suggests the diagnosis of fibromyalgia.")].  Dr. Guo did not prescribe any additional medications and recommended that the claimant continue use of his continuous positive airway pressure ("CPAP") machine and continue B12 injections.  Dr. Guo wrote, "No work for now due to the persistent pain and headaches" and recommended follow up in three months.  [Exhibit 6F at 6].  On July 9, 2014, Dr. Guo authored a letter stating that the claimant was still under her care but that the claimant has not been able to work since on or about September 5, 2013, due to his medical condition.  [Exhibit 6F at 1].

On September 24, 2015, Dr. Guo provided another brief, one-page letter stating that the claimant is a patient of hers and describing the cause for treatment of the claimant as "a history of intractable headaches, and chronic pain which involves neck, lower back, upper and lower extremities." [Exhibit 7F].  No treatment or progress notes were included.  According to Dr. Guo, the clamant has been treated with medication "without good response."  [Exhibit 7F at 1].  Dr. Guo opined that the

---

[9] "The basal ganglia . . . are clusters of nerve cells surrounding the thalamus [of the human brain].  They are responsible for initiating and integrating movements." National Institutes of Health, National Institute of Neurological Disorders and Stroke, https://www.ninds.nih.gov/Disorders/Patient-Caregiver-Education/Know-Your-Brain (last viewed September 12, 2019).

AO 72A
(Rev.8/82)

claimant "is totally disabled due to constant severe pain" and is unable to work. [Exhibit 7F]. The ALJ assigned the opinion of Dr. Guo little weight. [R. 16].

The claimant was also treated by Marie Judith Cauvin, M.D. ("Dr. Cauvin"), with Piedmont Physicians Premier Medical, from 2013 until 2017. [Exhibit 7F at 2; R. 55]. According to Dr. Cauvin, the claimant has a fat tumor that is wrapping around his spinal cord causing him to experience severe pain. Dr. Cauvin indicated that the claimant's pain medications are unable to help him due to the location of the tumor. Dr. Cauvin noted that the claimant has transient ischemic attacks due to high blood pressure and that there was also a history of mini strokes. [Exhibits 11F, 12F]. On September 24, 2015, Dr. Cauvin authored a one-page letter on Plaintiff's behalf stating her opinion that the tumor wrapping around Plaintiff's spinal cord at L5 causes him severe pain and raises his blood pressure and that, as a result of elevated blood pressure, the claimant has had a few TIA (mini strokes). [Exhibit 7F at 2]. According to Dr. Cauvin, the claimant suffers from insomnia due to pain and is unable to sit, stand, or walk for long periods of time. Dr. Cauvin opined that the claimant is at "great risk of paralysis and death" and is "totally disabled." [Exhibit 7F at 2].

On April 26, 2017, in a brief, one-page letter, Dr. Cauvin again described the claimant as being "totally disabled and unable to work." [Exhibit 7F at 2]. Dr. Cauvin did not attach any treatment or progress notes. The ALJ assigned the opinion

13

Dr. Cauvin little weight.  [R. 16].  The ALJ noted that there was no objective medical evidence to support the claimant's assertions of a fat tumor or Dr. Cauvin's opinion that the tumor and related pain was a precipitating factor in the claimant's high blood pressure and hypertensive episodes.  [R. 20].

On March 29, 2016, the claimant received follow up treatment for reported back pain that radiated to his extremities and increased blood pressure.  However, the records describe the claimant as being in no distress.  At times, the claimant's blood pressure was elevated at 170/107. He was also assessed with having mixed hyperlipidemia, and the claimant was counseled on his diet and exercise.  The claimant's blood pressure fluctuated and was also noted as low as 130/78.

On April 22, 2016, an MRI of the claimant's lumbar spine reflected evidence of a shallow right sub-articular disc protrusion at the L5-S1 level, but there was minimal contact with the right S1 nerve root and no significant nerve displacement or central canal stenosis.  The claimant's prominent ventral epidural fat was noted with a congenitally diminutive L5-S1 spinal canal.  There was also "minimal" disc bulge and facet degeneration.  Overall, there was no significant central canal stenosis at any level and no abnormal enhancement. [Exhibits 9F, 11F].

AO 72A
(Rev.8/82)

<u>State Agency Consultants</u>

The claimant's medical records were reviewed by State agency physicians and psychologists.[10]  [Exhibits 1A–8A].  On November 22, 2013, Bettye Stanley, D.O. ("Dr. Stanley"), conducted an initial review of the claimant's medical record and assessed all alleged physical impairments as non-severe. [Exhibit 1A at 10].  Dr. Stanley noted that the claimant does not appear fully credible and that the medical evidence does not support his statements.  [Exhibit 1A at 10].  Spurgeon Cole, Ph.D. ("Dr. Cole"), opined as to the claimant's mental impairments and related functioning. [Exhibit 1A at 10–16].  According to Dr. Cole, the claimant was limited in the areas of understanding and memory capacities and sustained concentration and persistence. Dr. Cole did not find any limitations in social interaction or adaptation.  More specifically, Dr. Cole opined that the claimant was moderately limited in his ability to carry out detailed instructions, in his ability to make simple work-related decisions, and in his ability to maintain concentration, persistence, or pace.[11]  [Exhibits 1A, 5A].

_____

[10] The ALJ's decision refers to the State agency consultants as the "DDS" as opposed to identifying each by name.  Unless identified by name, reference to the "DDS" within this Final Opinion & Order will also refer generally to any of the State agency consultants.

[11] In error, the ALJ wrote that the DDS opined that the claimant was "mildly limited in his ability to maintain concentration, persistence, or pace" as opposed to moderately limited.  [R. 14].  However, as discussed in greater detail *infra*, the ALJ's error was within the context of discussing the paragraph B criteria at step three of the

AO 72A
(Rev.8/82)

The additional explanation of the proposed mental RFC (as to Questions "A&B") reads as follows:

> A&B: CLAIMANT CAN UNDERSTAND, REMEMBER, AND CARRY OUT SIMPLE, BUT NOT DETAILED INSTRUCTIONS. ATTENTION IS VARIABLE. CLAIMANT MAY HAVE EPISODIC PROBLEMS W/CONCENTRATION FOR EXTENDED TASKS. CLAIMANT SHOULD BE CAPABLE OF CONCENTRATION FOR UP TO TWO HOURS WITH BREAKS. PACE MAY BE EPISODICALLY SLOWED SECONDARY TO PSYCH SYMPTOMS.

[Exhibit 1A at 14 (emphasis in original)].

On March 28, 2014, the initial mental RFC assessment was affirmed on reconsideration and adopted by Steven Kaye, Ph.D. ("Dr. Kaye"), with no change. [Exhibit 5A]. On reconsideration, in terms of physical impairment and related functional limitations, the State agency physicians opined that the claimant can frequently lift 25 pounds as well as sit, stand, and walk for six hours out of an eight-hour workday. Although the claimant possessed postural and manipulative limitations, the DDS noted that he did not have any visual, communicative, or environmental restrictions. Overall, the DDS indicated that the claimant possessed a RFC to perform a range of medium work. [Exhibit 5A].

The ALJ gave some weight to the opinion of the DDS because he had the benefit of reviewing some of the claimant's medical file before formulating his opinions. The

---

sequential evaluation process.

ALJ recognized, however, that the DDS did not have all of the claimant's treatment records. Based upon the evidence of record, the ALJ concluded that the claimant could reasonably expect to experience some degree of functional limitation due his weight and reduced his RFC to a range of light work.[12]

Plaintiff's Function Report & Collateral Source Statement

The Adult Function Report completed by Plaintiff and the Third Party Function Report, which was completed by the claimant's mother (Mira Crawley), indicated that the claimant's conditions affected his ability to lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs, complete tasks, concentrate, and / or use his hands.[13] [Exhibits 4E, 5E; R. 46]. However, the claimant described daily activities that are not limited to the extent one would expect, given the complaints of disabling symptoms and limitations. The Function Report revealed the claimant was able to independently perform basic hygiene such as dressing, grooming, shaving, using the toilet, and feeding himself even though he complained of pain. Despite the claimant's allegations of hypertension,

---

[12] The ALJ recognized that obesity can be an aggravating factor and can cause additional limitations relating to sitting, standing, walking, lifting, carrying, pushing, and pulling. [R. 18–19].

[13] The ALJ assigned the statements given by the claimant's mother little weight due to her lack of medical expertise and her natural desire to assist the claimant due to their relationship. [R. 17]. The ALJ explained that, "[w]hile it is difficult to confirm the presence of such motives, they are more likely in situations where the testimony in question departs substantially from the rest of the evidence of record." [R. 17].

AO 72A
(Rev.8/82)

hyperlipidemia, mild spondylosis of the cervical spine, mild degenerative disc disease of the lumbar spine, and obesity, the claimant was able to operate a motor vehicle and go out alone, shop in stores, and pay bills. [Exhibit 4E]. Moreover, the SSA earnings records reflected that the claimant worked after the alleged onset date, as mentioned above. [Exhibits 10D–14D].

Dr. Snook's Consultative Examination

The SSA ordered a consultative examination ("CE") to assess the claimant's mental impairments. On January 27, 2014, the claimant was evaluated by Steven Snook, Ph.D. ("Dr. Snook"). [Exhibit 5F]. The claimant's wife accompanied him to the evaluation. According to Dr. Snook's report, the only record available for his review was the claimant's Disability Report. [R. 489]. Dr. Snook administered the following assessment techniques: clinical interview, mental status examination, Wechsler Adult Intelligence Scale, Fourth Edition ("WAIS-IV"), Wide Range Achievement Test, Fourth Edition ("WRAT-IV"), and Trail Making Test Part A and B. [R. 489].

During the mental status examination, Dr. Snook observed that the claimant understood verbal instructions and initiated tasks independently. Dr. Snook described the claimant's thought associations as "grossly logical." His insight, judgment, and decision making skills were limited, but he was oriented to person, place, date, and

18

situation. [Exhibit 5F].  The claimant was assessed with mood disorder, and testing revealed a full scale IQ score of 66 (which represents a borderline range of intelligence).   Dr. Snook opined that the full scale IQ was considered under representative of the claimant's current abilities and that the index IQ scores were more representative of actual functioning. [Exhibit 5F at 5].  The claimant's index IQ scores were: verbal comprehension = 68, perceptual reasoning = 69, working memory = 66, and processing speed = 84. [Exhibit 5F at 6].  The claimant's recent and remote memory was fair.  The claimant was able to repeat four digits forward, three digits in reverse, and place three digits in numerical order.  He was also able to repeat three out of three words immediately, identify the current president, and recall three out of three words following a five-minute delay.  The claimant acknowledged that he has some close friends and spends time with his children.  The claimant was noted to have a Global Assessment of Functioning ("GAF") score of 60.[14]  [Exhibit 5F].

---

[14] GAF is a standard measurement of an individual's overall functioning level "with respect only to psychological, social and occupational functioning."  American Psychiatric Association Diagnostic and Statistical Manual of Mental Disorders, at 32 (4th ed. 1994) (DSM-IV).  According to the Diagnostic and Statistical Manual of Mental Disorders, 5th Edition, a GAF score between 51 and 60 represents moderate symptoms or moderate difficulty in social, occupational, or school functioning.  "[T]he GAF scale is just one tool used by clinicians to develop the clinical picture and it cannot be used in isolation from the rest of the evidence to make a disability decision."  Penna v. Colvin, 2015 WL 859091, at *4 (M.D. Fla. February 27, 2015).

AO 72A
(Rev.8/82)

Overall, Dr. Snook opined the claimant would likely be able to comprehend and recall simple, but not detailed, instructions. From a psychological perspective, the claimant would likely have difficulty sustaining concentration, persistence, and pace to permit the timely completion of assigned tasks in a typical work environment at this time. In addition, the claimant would likely have difficulty interacting with peers, supervisors, and the general public. Dr. Snook also opined that the claimant would likely have difficulty adapting to the stress of a typical work environment and that he has a likelihood of decompensating under stressful conditions due to psychiatric symptoms. However, Dr. Snook described the claimant's prognosis for psychological recovery as being "fair." [Exhibit 5F]. The ALJ assigned some weight to Dr. Snook's mental RFC opinion but did not adopt Dr. Snook's opinion in its entirety. [R. 15]. The ALJ reduced the claimant's RFC to simple work (at skill levels 1-2), with no reading requirements other than very short words. [R. 15].

VE Testimony

At the hearing, the ALJ asked Beth Crane, the impartial VE, to classify Plaintiff's past relevant work. [R. 84]. The VE classified the claimant's past relevant work as follows: a lubrication servicer (medium, semi- skilled work), a materials handler (heavy, semi-skilled work), and a tire technician (medium, skilled work). [R. 84]. Next, the ALJ asked the VE about the claimant's ability to perform his past

20

relevant work. Specifically, the ALJ proposed a hypothetical claimant of the same age, education, and vocational profile capable of light work, subject to the following limitations, including no climbing ropes, ladders or scaffolds, occasional reaching overhead bilaterally, frequent handling, fingering, and reaching otherwise bilaterally, occasional stooping, crouching, kneeling, and crawling, no concentrated exposure to hazards such as working at exposed heights, near dangerous machinery or driving, limited to simple tasks - working at skill levels 1 or 2, and no reading requirements other than very short words. [R. 85]. The VE opined that an individual similar to the claimant as described in the ALJ's original hypothetical would be unable to perform the past relevant work. [R. 85].

To determine the extent to which the identified limitations erode the unskilled light occupational base, the ALJ also asked the VE whether jobs exist in the national economy for an individual with the claimant's age, education, work experience, and RFC. The VE testified that, given all of these factors, the hypothetical claimant would be able to perform the requirements of representative occupations within the light work and unskilled category such as: a Counter Clerk (DOT # 249.366-010, with 118,000 jobs in the national economy), a Shipping and Receiving Weigher (DOT # 222.387-074, with 80,000 jobs nationwide), and a Small Parts Assembler (DOT #706.684-022,

with 92,000 jobs nationwide). [R. 85–87]. The ALJ then posed the following additional limitations to the VE (framed as hypothetical claimants two through five) and asked the VE to opine as to whether any of the additional restrictions would allow for competitive work. [R. 87]. The additional restrictions included that the hypothetical claimant would be unable to maintain focus, concentration, persistence, or pace for up to one-third of the workday on a daily basis, or would need frequent unscheduled breaks in addition to the regularly scheduled breaks on a daily basis, or would need to lie down at least two hours daily during the workday, or would be at least absent at least three days a month on a continuing unscheduled basis. [R. 87]. The VE testified that any of these additional limitations would preclude competitive work. [R. 87]. The VE also stated that her opinion concerning limitations related to focus, unscheduled breaks, lying down, being absent, and occasional reaching overhead bilaterally were based upon her education and experience. [R. 87].

Summary of ALJ's Decision

As previously discussed, the ALJ determined that the claimant's reported history of myocardial infarction, coronary artery disease, carpal tunnel syndrome, migraine headaches, history of stroke, history of transient ischemic attack, tendonitis, fat tumor of spinal cord, fibromyalgia, and bone spurs on spine are not medically determinable

22

impairments in that the reported history for these impairments consists solely of statements made by the claimant that are not supported by the record and, in fact, were ruled out by medical testing.[15]  [R. 15].  The ALJ also pointed out that there were no objective treatment records or emergency room ER visits for any of these conditions after the alleged onset date.  [R. 15].

Significantly, the ALJ observed that the claimant has a consistent pattern of exaggerating his conditions.  [R. 20].  According to the ALJ, the claimant's exaggeration suggests that lesser weight should be given to his allegations of severe pain.  [R. 20].  He reported several episodes of chest pain in 2013, and he and his wife began to report these as myocardial infarctions, despite all testing, including a cardiac catheterization, an echocardiogram, and cardiac enzyme testing showing no coronary artery disease or evidence of myocardial infarctions. [Exhibits 3F, 10F, and 1F].  He complained of hand and feet numbness and tingling, but a March 2013 Nerve

---

[15] Although the claimant complained of having several episodes of chest pain, his echocardiogram, cardiac enzyme testing, showed no evidence of coronary artery disease or myocardial infarction.  He also complained of hand and feet numbness and tingling, but his nerve conduction study was negative. [Exhibits 1F, 3F, 10F].  The claimant also presented to Piedmont Newnan Hospital with complaints of numbness and headaches, but the records indicated that his pain was relieved with the use of 800 mg of Ibuprofen.  A CT scan of the claimant's brain did not demonstrate any evidence of an intracranial abnormality with the exception of a suspected old infarct on the left basal ganglia region that Dr. Guo believed to be a cyst.  [Exhibits 2F, 6F].

AO 72A
(Rev.8/82)

Conduction Study was negative. The ALJ noted that the claimant began to report carpal tunnel syndrome as part of his past medical history as other impairments were ruled out. [Exhibits 1F, 9F]. He complained of severe neck pain, but objective testing of the cervical spine was negative. He then began to complain of low back pain, but objective testing indicated only mild conditions. All objective testing has shown mild or no conditions. He does have some fat deposits near the lumbar spine, but this is not a tumor from the evidence. He complained of severe headaches that appeared with no objective support in September 2013, but first reported the pain was slight, 5/10, then reported to Dr. Guo that it was 10/10. [Exhibits 10F, 6F].

The ALJ found that Plaintiff was capable of performing less than the full range of light work. [R. 16–17]. The ALJ stated that the RFC is supported by the medical records, the lack of aggressive medical treatment, and the claimant's own description of his daily activities after the alleged onset date. [R. 22]. Pursuant to SSR 00-4p, the ALJ determined that the VE's testimony was consistent with the DOT. [R. 22]. Finally, the ALJ concluded that the VE's testimony supported a finding that, considering the claimant's age, education, work experience, and RFC, Plaintiff is capable of making a successful adjustment to other work and, therefore, is not disabled. [R. 22].

24

Additional facts will be set forth as necessary during discussion of Plaintiff's arguments.

## II.    Standard of Review

An individual is considered to be disabled if he is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A).   The impairment or impairments must result from anatomical, psychological, or physiological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques and must be of such severity that the claimant is not only unable to do his previous work but cannot, considering age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy.  See 42 U.S.C. §§ 423(d)(2) and (3).

"We review the Commissioner's decision to determine if it is supported by substantial evidence and based upon proper legal standards." Lewis v. Callahan, 125 F.3d 1436, 1439 (11th Cir. 1997).  "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion."   Id. at 1440.   "Even if the evidence preponderates against the

[Commissioner's] factual findings, we must affirm if the decision reached is supported by substantial evidence." Martin v. Sullivan, 894 F.2d 1520, 1529 (11th Cir. 1990). "'We may not decide the facts anew, reweigh the evidence, or substitute our judgment for that of the [Commissioner].'" Phillips v. Barnhart, 357 F.3d 1232, 1240 n.8 (11th Cir. 2004) (quoting Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983)).

"The burden is primarily on the claimant to prove that he is disabled, and therefore entitled to receive Social Security disability benefits." Doughty v. Apfel, 245 F.3d 1274, 1278 (11th Cir. 2001) (citing 20 C.F.R. § 404.1512(a)). Under the regulations as promulgated by the Commissioner, a five step sequential procedure is followed in order to determine whether a claimant has met the burden of proving his disability. See Doughty, 245 F.3d at 1278; 20 C.F.R. §§ 404.1520, 416.920. At step one, the claimant must prove that he is not engaged in substantial gainful activity. See id. The claimant must establish at step two that he is suffering from a severe impairment or combination of impairments. See id. At step three, the Commissioner will determine if the claimant has shown that his impairment or combination of impairments meets or medically equals the criteria of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. See Doughty, 245 F.3d at 1278; 20 C.F.R. §§ 404.1520, 416.920. If the claimant is able to make this showing, he will be considered

disabled without consideration of age, education, and work experience. See id. "If the claimant cannot prove the existence of a listed impairment, he must prove at step four that his impairment prevents him from performing his past relevant work." Doughty, 245 F.3d at 1278. "At the fifth step, the regulations direct the Commissioner to consider the claimant's residual functional capacity, age, education, and past work experience to determine whether the claimant can perform other work besides his past relevant work." Id. If, at any step in the sequence, a claimant can be found disabled or not disabled, the sequential evaluation ceases and further inquiry ends. See 20 C.F.R. §§ 404.1520(a), 416.920(a).

### III. ALJ's Findings of Fact

1. The claimant meets the insured status requirements of the SSA through December 31, 2018.

2. The claimant has not engaged in substantial gainful activity since September 4, 2013, [the] application date. [20 C.F.R. §§ 404.1571, *et seq.*, 416.971, *et seq.*].

3. The claimant has the following severe impairments: hypertension; hyperlipidemia; mild spondylosis of the cervical spine; mild degenerative disc disease of the lumbar spine; and obesity. [20 C.F.R. §§ 404.1520(c), *et seq.*, and 416.920(c)].[16]

---

[16] The ALJ determined that the claimant's insomnia, ventral fat epidural deposits near his spinal cord, and visual diagnoses are not severe impairments. [R. 13]. Similarly, the ALJ determined that the claimant's medically determinable mental impairments of mood disorder and borderline intellectual functioning, considered

27

4.      The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. [20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926].

5.      The claimant has the RFC to perform less than a full range of light work as defined in 20 C.F.R. §§ 404.1567(b) and 416.967. The claimant cannot perform any climbing of ropes, ladders, or scaffolds. The claimant can perform occasional stooping, crouching, kneeling, crawling, and reaching overhead bilaterally. The claimant can frequently perform handling, fingering, and reaching in other directions bilaterally. The claimant must avoid concentrated exposure to hazards. The claimant can perform work (at skill levels 1–2), with no reading requirements other than very short words.

6.      The claimant is unable to perform any past relevant work. [20 C.F.R. §§ 404.1565 and 416.965].

7.      The claimant was born on October 24, 1975, and was 37 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date. [20 C.F.R. §§ 404.1563 and 416.963].

8.      The claimant has a limited education and is able to communicate in English. [20 C.F.R. §§ 404.1564 and 416.964].

9.      Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills. [See SSR 82-41 and 20 C.F.R. Part 404, Subpart P, Appendix 2].

_____

singly and in combination, do not cause more than minimal limitation in the claimant's ability to perform basic mental work activities and are therefore non severe. [R. 13].

AO 72A
(Rev.8/82)

10. Considering the claimant's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that the claimant can perform. [20 C.F.R. §§ 404.1569, 404.1569(a), 416.969, and 416.969(a)].

11. The claimant has not been under a disability, as defined in the Social Security Act, from September 4, 2013, through August 17, 2017 (the date of the decision). [20 C.F.R. § 416.920(f)].

## IV. Discussion

On appeal, Plaintiff contends that the ALJ committed reversible error by improperly evaluating the medical opinion of Dr. Snook and that, for this reason, the ALJ's RFC determination is not supported by substantial evidence.[17] As discussed below, the Court finds that the ALJ properly evaluated the medical opinion evidence and applied the proper legal standards in formulating Plaintiff's RFC. Accordingly, the Court will affirm the decision of the Commissioner.

### A. RFC Assessment

"The [RFC] is an assessment, based upon all of the relevant evidence, of a claimant's remaining ability to do work despite his impairments. . . . Along with his

---

[17] Significantly, Plaintiff does not challenge the ALJ's evaluation of Plaintiff's physical impairments or the RFC's exertional limitations. For this reason, the Court addresses the opinions of Plaintiff's treating physicians solely for the purpose of explaining how the ALJ dealt with Plaintiff's subjective complaints of pain, which presumably is alleged to exacerbate Plaintiff's capabilities in the area of concentration, persistence, and pace.

AO 72A
(Rev.8/82)

age, education and work experience, the claimant's [RFC] is considered in determining whether the claimant can work." Lewis, 125 F.3d at 1440 (citing 20 C.F.R. §§ 404.1545(a), 404.1520(f)). "RFC includes physical abilities, such as sitting, standing or walking, and mental abilities, such as the ability to understand, remember and carry out instructions or to respond appropriately to supervision, coworkers and work pressure." Dempsey v. Comm'r of Social Security, 454 Fed. Appx. 729, 731 n.3 (11th Cir. 2011) (citation omitted). In determining the claimant's RFC, the ALJ must consider the limiting effects of all of the claimant's impairments. See Phillips, 357 F.3d at 1238 ("[T]he ALJ must determine the claimant's RFC using all relevant medical and other evidence in the case."); and see 20 C.F.R. §§ 404.1522, 416.945(e). "[T]he ALJ [is] required to consider all [of Plaintiff's] impairments – severe or non-severe – in combination." Brown v. Comm'r of Social Security, 680 Fed. Appx. 822, 827 (11th Cir. 2017) (citing Hudson v. Heckler, 755 F.2d 781, 785 & n.2 (11th Cir. 1985)). Social Security Ruling 96-8p provides, "The RFC assessment must always consider and address medical source opinions. If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted."

The ALJ's evaluation of the medical source opinion evidence is discussed first as it informs formulation of the RFC.

## B.    Evaluation of Medical Opinion Evidence

"There are three tiers of medical opinion sources: (1) treating physicians; (2) nontreating, examining physicians; and (3) nontreating, nonexamining physicians." Himes v. Comm'r of Social Security, 585 Fed. Appx. 758, 762 (11th Cir. 2014) (citing 20 C.F.R. §§ 404.1527(c)(1)-(2),416.927(c)(1)-(2)); accord Lee v. Colvin, 2015 WL 5307513, at *3 (M.D. Fla. September 10, 2015) ("The Regulations establish a 'hierarchy' among medical opinions that provides a framework for determining the weight afforded each medical opinion . . . ."). "The opinions of examining physicians are generally given more weight than non-examining physicians; treating physicians receive more weight than non-treating physicians; and specialists on issues within their areas of expertise receive more weight than non-specialists." Schuhardt v. Astrue, 303 Fed. Appx. 757, 759 (11th Cir. 2008) (citing 20 C.F.R. § 404.1527(d)(1), (2), (5)).

It is well established that the determination about whether a claimant has met the statutory definition of disability is reserved to the Commissioner and, for that reason, a medical source's opinion that a claimant is disabled is not controlling.  See 20 C.F.R. §§ 404.1527(d), 416.927(d); Bell v. Bowen, 796 F.2d 1350, 1353–54 (11th Cir. 1986)

31

(quoting § 404.1527 for proposition that the Commissioner determines disability notwithstanding claimant's physician's statement that claimant is "disabled" or "unable to work"); <u>accord</u> <u>Eyre v. Comm'r, Social Security Admin.</u>, 586 Fed. Appx. 521, 523 (11th Cir. 2014) (citations omitted).

The Eleventh Circuit has consistently held that opinions of treating physicians must be accorded substantial or considerable weight by the Commissioner unless good cause exists to discredit these opinions.[18]  <u>See</u> <u>Lewis</u>, 125 F.3d at 1440; <u>Lamb v Bowen</u>, 847 F.2d 698, 703 (11th Cir. 1988); <u>MacGregor v. Bowen</u>, 786 F.2d 1050, 1053 (11th Cir. 1986); <u>Broughton v. Heckler</u>, 776 F.2d 960, 961 (11th Cir. 1985). "Good cause exists 'when the: (1) treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records.'" <u>Winschel v. Comm'r of Social Security</u>, 631 F.3d 1176, 1179 (11th Cir. 2011) (quoting <u>Phillips</u>, 357 F.3d at 1241).  An ALJ may disregard a treating physician's opinion with good cause, but his reasons for doing so must be clearly articulated in his decision.  <u>Id.</u>  In

---

[18] "New regulations eliminated the treating physician rule last year, <u>see</u> 20 C.F.R. § 404.1520c, but the rule is effective only for claims filed after March 27, 2017 . . . .  For claims . . . that were filed before March 27, 2017, the rules in § 404.1527 continue to apply."  <u>Rainey v. Berryhill</u>, 731 Fed. Appx. 519, 523 n.2 (7th Cir. 2018).

32

determining the weight attributable to medical opinions, the Commissioner is required to consider the following factors: (1) examining relationship; (2) nature and extent of the treatment relationship; (3) supportability; (4) consistency; (5) specialization; and (6) any other relevant factors. See 20 C.F.R. §§ 404.1527(c), 416.927(c).

As noted, Plaintiff challenges the ALJ's evaluation of Dr. Snook's medical opinion and argues that the IQ testing Dr. Snook performed should not have been discounted because the testing results were consistent with Plaintiff's school history and identification as being learning disabled and that the RFC is flawed because it only included mild limitations in concentration, persistence, and pace, which is a misrepresentation of the opinion of the State agency psychological consultants the ALJ credited.[19]

In the instant case, because the Plaintiff had no mental health treatment and did not have a treating psychologist or psychiatrist, there is no treating source opinion regarding his mental impairments and limitations. [Doc. 12 at 16 (listing record cites)]. The SSA ordered the administration of the CE with Dr. Snook, which consisted of a

---

[19] The Commissioner concedes that the ALJ mistakenly represented in the decision that the State agency psychological consultants found that Plaintiff would only have "mild" limitations in the area of concentration, persistence, and pace as opposed to "moderate" limitations but asserts that the error is harmless given the RFC. [Doc. 12 at 19]. The Court agrees.

single examination and, therefore, was not entitled to any special weight or deference. See McSwain v. Bowen, 814 F.2d 617, 619 (11ᵗʰ Cir. 1987); and see 20 C.F.R. §§ 404.1527(c)(3) and (4) and 416.927(c)(3) and (4). Drs. Cole and Kaye did not examine Plaintiff, but both possess certain expertise as State agency psychologist consultants. See Brandt v. Astrue, 2010 WL 746446, at *7 (M.D. Fla. March 3, 2010) (citing 20 C.F.R. § 1527(f)(2); SSR 96-6P) ("State agency medical consultants are considered experts in disability evaluation, and their opinions may provide substantial evidence to support a finding of no disability."). The ALJ credited each of these medical opinions in part when determining RFC.

As explained herein, the Court finds that the ALJ properly evaluated the medical source opinions addressing Plaintiff's mental or non-exertional impairment.

## 1.     State Agency Psychologist Consultant

State agency psychological consultant, Dr. Cole, opined that the claimant was moderately limited in his ability to carry out detailed instructions, in his ability to make simple work-related decisions, and in his ability to maintain concentration, persistence, or pace.  [Exhibit 1A at 14].  Dr. Cole explained further:

> CLAIMANT CAN UNDERSTAND, REMEMBER, AND CARRY OUT SIMPLE, BUT NOT DETAILED INSTRUCTIONS.  ATTENTION IS VARIABLE.   CLAIMANT  MAY  HAVE  EPISODIC  PROBLEMS

34

W/CONCENTRATION FOR EXTENDED TASKS.  CLAIMANT
SHOULD BE CAPABLE OF CONCENTRATION FOR UP TO TWO
HOURS WITH BREAKS.  PACE MAY BE EPISODICALLY SLOWED
SECONDARY TO PSYCH SYMPTOMS.

[Exhibit 1A at 14].  Dr. Kaye adopted the same opinion on reconsideration. [Exhibit 5A].

The ALJ did not expressly state the weight he was assigning each of the individual medical opinions of the State agency consultants but stated that "[s]ome weight is given to the opinion of the DDS. . . ."[20]  [R. 19].  And it is evident from the decision that the ALJ largely credited all of the DDS opinions in that the ALJ discussed the substance of the opinions as to both physical and mental impairments and restrictions throughout the decision.  [R. 14 (specifically addressing DDS opinions in connection with paragraph B criteria), 18–19].  Moreover, the ALJ explained that he was assigning Dr. Snook's psychological CE "less weight than the weight assigned to the State agency consultants."  [R. 15].  Therefore, the ALJ gave the DDS opinions more weight than Dr. Snook's CE opinion.  See Brandt, 2010 WL 746446, at *7

---

[20] Plaintiff represents that the ALJ did not indicate what weight he assigned the State agency psychological consultants and only spoke to the weight assigned the DDS regarding physical limitations.  [Doc. 11 at 18].

(citations omitted).  As explained herein, the ALJ properly discounted Dr. Snook's opinion and adequately explained his rationale for doing do.

As previously discussed, the ALJ mistakenly referred to the DDS mental RFC opinion as proposing mild limitation in concentration, persistence, and pace.  The ALJ's "error" was made within his discussion of the "paragraph B criteria" – which is a different inquiry than determining RFC at step four.[21]  See 20 C.F.R. Subpart P, App. 1, § 12.00.  The ALJ explained that the evidence as a whole, including the DDS opinions and Dr. Snook's evaluation and findings, supports the finding that the claimant had no more than mild difficulties in the area of concentrating, persisting, or maintaining pace.  [R. 14].  Plaintiff's argument that this error warrants remand is not persuasive in that the Court deems the ALJ's error harmless in light of the RFC.

---

[21] "When evaluating mental impairments, [the] SSA first determines the degree of functional limitation by looking to the 'B criteria,' so named because they are in paragraph B of each listing under 20 C.F.R. Subpart P, App. 1, § 12.00 (except 12.05). . . . The ALJ examines these criteria twice: first at step two of disability determination to decide whether an impairment is severe and, if so, again at step three to determine whether the claimant meets a listing somewhere at section 12.00.  This analysis is described as the 'special technique.'"  Sanders, David A., U.S. Magistrate Judge, Northern District of Mississippi, FEDERAL JUDICIAL CENTER POCKET GUIDE SERIES, SOCIAL SECURITY DISABILITY APPEALS,  Appendix: Definitions and Core Concepts (2019) (citing 20 C.F.R. § 404.1520a(d); 20 C.F.R. Part 404, Subpart P, App. 1, § 12.00).

AO 72A
(Rev.8/82)

## 2. Dr. Snook

Dr. Snook evaluated Plaintiff in January 2014 and opined that the claimant would likely be able to comprehend and recall simple but not detailed instructions. In addition, Dr. Snook opined that, at that time, from a psychological perspective, the claimant would likely have difficulty sustaining concentration, persistence, and pace to permit the timely completion of assigned tasks in a typical work environment. In addition, the claimant would likely have difficulty interacting with peers, supervisors, and the general public. Dr. Snook also opined that the claimant would likely have difficulty adapting to the stress of a typical work environment and has a likelihood of decompensating under stressful conditions due to psychiatric symptoms. [Exhibit 5F]. However, this claimant had *no prior mental health treatment* and did not voice concerns about his mental health when seen for physical complaints.

The ALJ discounted Dr. Snook's opinion, in part, due to the fact that Dr. Snook's evaluation was limited in scope (i.e., a single occasion) and because Plaintiff and his spouse reported to Dr. Snook various symptoms caused by "non-existent multiple myocardial infarctions, etc." Significantly, the ALJ recognized that the claimant's characterization of his medical history and pain allegations, unsupported except by his statements, had likely skewed Dr. Snook's evaluation. [R. 15]. The ALJ

explained that he was assigning Dr. Snook's psychological CE less weight than the weight assigned to the State agency consultants because the claimant and his wife informed Dr. Snook about non-existent multiple myocardial infarctions and transient ischemic attacks and seemed to suggest that his mental health issues were substantial, whereas he has consistently had normal mood and affect across all other records. [Exhibit 5F, 9F at 4; Exhibit 3F at 27]. This inconsistency between Dr. Snook's evaluation and the other medical evidence is an appropriate factor for the ALJ to consider in evaluating opinion evidence. See 20 C.F.R. §§ 404.1527(c), 416.927(c). And the opinion of Dr. Snook, who only examined Plaintiff once, is not entitled to special deference or weight. See McSwain, 814 F.2d at 619. The Court finds that the ALJ applied proper legal standards and adequately explained his reasoning.

**B.     Substantial Evidence Supports The ALJ's RFC Determination**

First, determining RFC is an administrative task reserved for the ALJ. See Robinson v. Astrue, 365 Fed. Appx. 993, 999 (11th Cir. 2010) ("[T]he task of determining a claimant's [RFC] and ability to work is within the province of the ALJ . . . ."); accord 20 C.F.R. §§ 416.927(d)(2) and 20 C.F.R. 416.946(c) ("If your case is at the administrative law judge hearing level . . ., the administrative law judge . . . is responsible for assessing your [RFC].")

In this case, the ALJ found that:

> [T]he claimant has the [RFC] to perform less than a full range of light work as defined in 20 C.F.R. §§ 404.1567(b) and 416.967. The claimant cannot perform any climbing of ropes, ladders, or scaffolds. The claimant can perform occasional stooping, crouching, kneeling, crawling, and reaching overhead bilaterally. The claimant can frequently perform handling, fingering, and reaching in other directions bilaterally. The claimant must avoid concentrated exposure to hazards. The claimant can perform work (at skill levels 1–2), with no reading requirements other than very short words.

[R. 16–17]. In formulating Plaintiff's RFC, the ALJ explained that, while the claimant complained of pain, he has not taken much in the way of pain medications because he asserts that nothing works, so the medications have largely been stopped over the years. [R. 19]. In addition, the ALJ stated that the claimant may have a learning disorder but that cognitive issues did not prevent him from working for years as a tire technician with pay of up to $35,709 in 2009, and $21,925 in 2011. [R. 19 (citing Exhibits 8D-10D, 5F)]. Next, the ALJ stated that the claimant's full scale IQ score is viewed with same suspicion as the examiner (Dr. Snook) gave it. [R. 19]. Dr. Snook opined that the index IQ scores were more representative than the full scale IQ, and Plaintiff's processing speed index was an 84. [Exhibit 5F at 6]. Finally, the ALJ accepted the borderline intellectual function diagnosis, which he stated was accounted for within the RFC with simple, reading requirements limited to short words. [R. 19].

39

Plaintiff next argues that the Stage agency consultant opinions corroborate or even bolster Dr. Snook's medical opinion and that remand is required because the ALJ was mistaken about the degree of limitation proposed by Drs. Cole and Kaye as to Plaintiff's ability for sustained concentration, persistence, and pace. [Doc. 11 at 17]. To clarify, Drs. Cole and Kaye opined that Plaintiff "may" have difficulties with extended concentration or pace while also stating that Plaintiff could complete simple work tasks and could sustain concentration for the completion of work tasks with customary breaks. [Exhibit 1A at 14; Exhibit 5A at 15]. And the State agency consultants emphasized that the claimant's functional limitations in this area would be *episodic* and that his "pace may be *episodically* slowed secondary to psych symptoms." [Exhibit 1A at 14 (emphasis provided); Exhibit 5A at 15 (emphasis provided)]. The RFC limits Plaintiff to perform work (at skill levels 1–2), which tracks and is consistent with the DDS opinion. [Exhibit 1A at 14; Exhibit 5A at 15]. The RFC's restriction of Plaintiff to simple work adequately addresses the concentration, persistence, and pace limitation when the medical evidence demonstrates that the claimant can perform such work. See Winschel, 631 F.3d at 1180–81 (11th Cir. 2011); Lee v. Comm'r, Social Security Admin., 551 Fed. Appx. 539, 540–41 (11th Cir. 2014) (ALJ's limitation to simple work accounted for claimant's mental limitations); Neefe

v. Comm'r, Social Security, 531 Fed. Appx. 1006, 1007 (11th Cir. 2013) (ALJ's limitation to simple tasks accounted for claimant's mental impairments).

In short, the ALJ's evaluation of and reliance on the RFC opinions of State agency consultants Dr. Cole and Dr. Kaye was entirely proper and does not amount to reversible error. See Diorio v. Heckler, 721 F.2d 726, 726 (11th Cir. 1983); see also Denomme v. Comm'r, Social Security Admin., 518 Fed. Appx. 875, 878 (11th Cir. 2013) (no reversible error where psychologist opined claimant had moderate limitations in ability to relate to coworkers but no significant limitations in social interactions such that the overall opinion of the state agency psychological consultant was properly considered). The ALJ's RFC accounted for the medical opinions of the State agency psychological consultants and implicitly credited the mental RFC opinions to the extent consistent with the RFC.

In sum, Plaintiff's arguments in support of his motion to remand are all based upon the weight of the evidence. Plaintiff, through counsel, invites the Court to reweigh the evidence and disregard the parameters of substantial evidence review. See Moore v. Barnhart, 405 F.3d 1208, 1213 (11th Cir. 2005) (emphasizing "the narrowly circumscribed nature of [the court's] appellate review, which precludes us from 're-weigh[ing] the evidence or substitut[ing] our judgment for that [of the Commissioner]

41

. . . even if the evidence preponderates against' the decision") (quoting <u>Bloodsworth</u>, 703 F.2d at 1239). However, the ultimate responsibility for reconciling the competing evidence of record and for fashioning Plaintiff's RFC is within the province of the ALJ. <u>See</u> <u>Wind v. Barnhart</u>, 133 Fed. Appx. 684, 691–93 (11th Cir. 2005). In conclusion, the Court finds that the ALJ applied proper legal standards when formulating Plaintiff's RFC, which is supported by substantial evidence.

In light of these facts, the Court concludes that Plaintiff has failed to show that the ALJ erred when he found that Plaintiff was not under a disability at any time from September 4, 2013, the alleged onset date and date of application, through August 17, 2017, the date of the ALJ's decision. [R. 22].

## V.     Conclusion

For all the foregoing reasons and cited authority, the Court concludes that the decision of the ALJ was supported by substantial evidence and was the result of an application of proper legal standards. It is, therefore, **ORDERED** that the Commissioner's decision be **AFFIRMED**. The Clerk is **DIRECTED** to enter judgment in favor of the Commissioner.

AO 72A
(Rev.8/82)

**SO ORDERED THIS** 17TH day of SEPTEMBER, 2019.

JANET F. KING
UNITED STATES MAGISTRATE JUDGE

43